## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |
|---|---|
| MOBILE SATELLITE COMMUNICATIONS, INC. d/b/a PITTSBURGH INTERNATIONAL TELECOMMUNICATIONS, INC., | ) ) ) ) ) |
| **Plaintiff,** | ) ) |
| v. | ) )   **Civil Action No. 09-0436 (ESH)** |
| **INTELSAT USA SALES CORP.**, *et al.*, | ) ) ) |
| **Defendants.** | ) ) |

_____

### MEMORANDUM OPINION AND ORDER

Plaintiff Mobile Satellite Communications, Inc., d/b/a/ Pittsburgh International Telecommunications, Inc., has brought suit against Intelsat Sales Corp. and Intelsat Global Service Corp. for common law fraud and/or fraudulent inducement and tortious interference with contract.  Defendants have filed a Joint Motion to Dismiss, or in the Alternative, Motion for More Definite Statement.  For the reasons set forth below, the Court denies defendants' motion.

### BACKGROUND

Defendants operate a fleet of telecommunications satellites in geostationary orbit on which they lease bandwidth to telecommunications and broadcast companies and other entities. (Compl. ¶ 6.)  The companies lease the bandwidth in the form of a transponder - - a broadband channel that is part of the microwave repeater and antenna system housed onboard the operating satellite.  (*Id.*)  Plaintiff owns and operates a large, privately-owned satellite teleport facility through which it provides international access for video and data services.  (*Id.* ¶ 7.)  Plaintiff's facility operates on major domestic and international satellite systems in the C and Ku-bands.

(*Id.*)  In order to serve its clients, plaintiff leases satellite transponder bandwidth from several providers, including defendants.  (*Id.* ¶ 8.)  Defendants lease this bandwidth on both a preemptible or non-preemptible basis.  (*Id.* ¶ 9.)  Non-preemptible service may not be interrupted to restore other services, while preemptible service may be interrupted in order to restore service to non-preemptible transponders.  (*Id.*)

According to plaintiff, as a matter of corporate policy, it leases bandwidth only on a non-preemptible basis unless "clear assurances are provided to guarantee that service would be functionally comparable to non-preemptible."  (*Id.*)  Beginning in 2001, plaintiff leased non-preemptible service on two transponders on defendants' Galaxy 25 satellite.  (*Id.* ¶ 10.)  While Galaxy 25 had suffered solar array "string failures," causing power outages to several transponders, the satellite had a specific coverage area that was preferred by many of plaintiff's existing and potential customers.  (*Id.*)  Thus, in late 2006, plaintiff decided to lease a third transponder on Galaxy 25.  (*Id.* ¶ 11.)

Defendants wanted to persuade plaintiff to enter into a preemptible lease for the new transponder (*id.* ¶ 12), and plaintiff's representatives and those of defendants had several discussions regarding this issue:

> (1)   On or about November 1, 2006, Floyd Ganassi, plaintiff's chairman; Michael Asti, its CFO; and Jeffrey Wateska, its Chief Sales Officer; met with defendants' agents, Ron Rosenthal, Regional Vice President of North American Broadcast Solutions; and Jay Norway, Senior Account Manager; to discuss the possibility of plaintiff leasing an additional transponder.  (*Id.* ¶ 14.) Plaintiff alleges that during this meeting, Norway and Rosenthal stated that if plaintiff leased a preemptible transponder, it "would receive the highest priority service among the other Galaxy 25 preemptible transponders, using words to the effect that [plaintiff's] transponder would be 'last turned off and first turned on in the event of interruption.'"  (*Id.*)  Moreover, plaintiff alleges that Norway produced a "multi-color spreadsheet to illustrate [plaintiff's] priority as further assurance."  (*Id.*)  In the face of plaintiff's skepticism about signing a preemptible lease, defendants "persisted, offering extensive assurances that [plaintiff's]

transponder would be the last to be preempted and the first to be restored in the event of preemption." (*Id.* ¶ 15.)

   (2) On or about December 19, 2006, Norway, Rosenthal, and Kurt Riegelman, defendants' Senior Vice President of North American Sales, visited plaintiff's main facility. (*Id.* ¶ 16.) In response to plaintiff's concerns about a preemptible lease, Norway, Rosenthal, and Riegelman once again assured plaintiff that its transponder would be the last turned off and the first turned on in the event of preemption. (*Id.*)

   (3) During or around the week of April 9 -12, 2007, Wateska and Norway discussed the possibility of plaintiff leasing transponder K23 on Galaxy 25. (*Id.* ¶ 17.) In response to Wateska's preemption concerns, Norway again provided assurances that K23 would be the last turned off and the first turned on in the event of preemption. (*Id.*)

  In reliance on these representations, plaintiff signed a preemptible Lease Service Order for K23, dated April 12, 2007 (the "K23 Lease"), which incorporates by reference the preexisting Nonexclusive Service Agreement No. 03445-000, dated October 1, 2003 (the "NESA") between the parties.[1] (*Id.* ¶ 18; *see also* Defs.' Mot. to Dismiss Exhs. A, B.) Moreover, plaintiff also (1) repeated defendants' representations to its own customers and structured its services to its customers based thereon; (2) placed high-credit-quality customers on K23; and (c) refrained from making arrangements that would have made it easier to transition customers between K23 and plaintiff's other transponders. (Compl. ¶ 19.)

  The K23 Lease had an option to upgrade from preemptible to non-preemptible service at any time. (*Id.* ¶ 20.) However, to induce plaintiff not to exercise this option, defendants continued to assure plaintiff of the priority of K23. (*Id.*.)

  On or about September 18, 2007, Wateska contacted Norway regarding K23's priority as compared to K01, a preemptible transponder that had recently been leased to plaintiff's

---

[1] The only other party to the K23 Lease and the NESA is Intelsat USA Sales Corp. While plaintiff identifies various individuals as representatives or agents of both Intelsat USA Sales Corp. and Intelsat Global Service Corp., neither plaintiff nor defendants explain the relationship between the two parties.

competitor, RRSat Global Communications Network Ltd. ("RRSat") (*Id.* ¶ 21.)  Plaintiff alleges

on information and belief that RRSat, a publicly-traded company, "generally receives favorable

treatment [from defendants] compared to [plaintiff]."  (*Id.*)  Norway assured plaintiff that RRSat

held the lowest priority, stating words to the effect that RRSat's K01 was "one second

preemptible," meaning that K01 would be turned off on one second's notice, and plaintiff's K23

would be restored before K01 in the event of preemption. (*Id.*)  At a dinner in New York on or

about October 10, 2007, Norway again assured Wateska and Missy Gralish, another

representative of plaintiff, that plaintiff had a higher priority transponder than RRSat and others.

(*Id.* ¶ 22.)

On June 25, 2008, plaintiff entered into a contract with G.S.N. GoSat Distribution

Network Ltd. ("GoSat") to provide Ku-band service to GoSat on the K23 transponder.  (*Id.* ¶ 24.)

That contract permitted GoSat to terminate the agreement in the event that the K23 transponder

service was unavailable for a consecutive period of 24 hours.  (*Id.*)

On September 26, 2008, the Galaxy 25 satellite experienced a solar array string failure.

(*Id.* ¶ 25.)  To conserve power, defendants took two Ku-band and two C-band transponders

offline, including K23, which was taken down at 2:43 a.m. EDT.  (*Id.*)  Defendants did not

restore K23 to partial power until October 1, 2008 at 4:00 p.m. EDT and did not restore the

transponder to full power until October 9, 2008.  (*Id.*)  However, defendants restored service to

RRSat's K01 on September 27, 2008 at approximately 11:23 a.m. EDT; thus, K01 suffered only

about 24 hours of downtime.  (*Id.* at ¶ 27.)

Due to the delay in restoration of K23's service, GoSat exercised its right to terminate

service with plaintiff and moved its account to RRSat.  (*Id.* ¶28.)  Moreover, plaintiff alleges that

it lost other customers as well, costing it $2 million in profits, and that it incurred the expenses of moving customers to other transponders in order to minimize the disruption.  (*Id.* ¶¶ 27-28.)

Plaintiff alleges that defendants (1) intentionally misrepresented that K23 would have priority in the event of preemption in order to induce plaintiff to enter into the K23 Lease and to refrain from exercising its option to convert K23 to non-preemptible status so that defendants could obtain operational flexibility, secure revenue and profit by selling more space on existing bandwidth, and justify discrimination among preemptible lessees on the basis of favoritism and business needs and (2) intentionally took actions they knew would cause plaintiff's customers to terminate their contracts with plaintiff in order to assist RRSat, one of defendants' preferred customers.  (*See id.* ¶¶ 33-35, 42.)

## ANALYSIS

## I.     Standard of Review

When ruling on a motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6), a court must accept as true all of the factual allegations contained in the complaint. *Atherton v. Dist. of Columbia Office of Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009) (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)).  "'So long as the pleadings suggest a 'plausible' scenario to show that the pleader is entitled to relief, a court may not dismiss.'"  *Id.* (quoting *Tooley v. Napolitano*, 556 F.3d 836, 839 (D.C. Cir. 2009) (edits omitted)).  However,

> [t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

*Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (internal quotation marks and citations omitted).

In deciding the motion, the court "may consider only the facts alleged in the complaint, any

documents either attached to or incorporated in the complaint and matters of which [courts] may

take judicial notice." *E.E.O.C. v. St. Francis Xavier Parochial School*, 117 F.3d 621, 624 (D.C.

Cir. 1997).

## II.     Choice of Law

Federal courts sitting in diversity must apply the choice-of-law rules of the forum state.

*Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *YWCA v. Allstate Ins. Co.*, 275

F.3d 1145, 1150 (D.C. Cir. 2002).  Under District of Columbia law, "parties to a contract may

specify the law they wish to govern, as part of their freedom to contract, as long as there is some

reasonable relationship with the state specified." *Norris v. Norris*, 419 A.2d 982, 984 (D.C.

1980).  In this case, the NESA contains a choice of law provision, which specifies that New York

law will govern the "validity, interpretation, operation, and effect" of the contract.  (NESA §

21.1.)  The parties do not dispute the applicability of New York law to the interpretation of the

contract, and plaintiff avers that agents for the parties met in New York at least once (*see* Compl.

¶ 22).  Accordingly, the Court will apply the parties' choice of New York law to the

interpretation of the contract.

The parties do dispute, however, which law governs plaintiff's common law causes of

action.  Plaintiff contends that either New York or Pennsylvania law governs this action, while

defendant claims that either the District of Columbia or Pennsylvania law governs.  Restatement

(Second) of Conflict of Laws §§ 145, 148 are relevant to this analysis.  Section 145 of the

Restatement sets forth general principles governing tort cases, while § 148 sets forth factors

specifically applicable in cases of fraud and misrepresentation.  The District of Columbia Court

of Appeals, however, has applied § 145 even in cases of fraudulent misrepresentation.  *See, e.g.,Washkoviak v. Student Loan Mktg. Ass'n*, 900 A.2d 168 (D.C. 2006).  Under District of Columbia law, courts employ "a modified governmental interests analysis which seeks to identify the jurisdiction with the most significant relationship to the dispute."  *Id.* at 180 (internal quotation marks omitted).  Under this analysis, the court must "evaluate the governmental policies underlying the applicable laws and determine which jurisdiction's policy would be more advanced by the application of its law to the facts of the case under review."  *Id.*  As part of this analysis, courts also consider the factors enumerated in § 145 of the Restatement: (1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (4) the place where the relationship is centered.  *Id.*

On the other hand, the D.C. Court of Appeals also has held that § 148 of the Restatement "provides a useful framework for selecting the law which applies to multi-state misrepresentation claims."  *Hercules & Co. v. Shama Rest. Corp.*, 566 A.2d 31, 43 (D.C. 1989).  Under that section, the relevant factors are:  (1) the place, or places, where plaintiff acted in reliance on defendant's representations; (2) the place where plaintiff received the representations; (3) the place where defendant made the representations; (4) the domicile, residence, nationality, place of incorporation and place of business of the parties; (5) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time; and (6) the place where plaintiff is to render performance under a contract which he has been induced to enter by the false representations of defendant.

Based on the record before the Court, it concludes that Pennsylvania has the most significant relationship to this dispute.  Plaintiff is a Pennsylvania corporation with its principal

place of business there; it was injured there as a result of defendant's alleged misrepresentations, which induced it to enter the K23 Lease; and it was in that jurisdiction that plaintiff acted on the alleged misrepresentations.[2]  Pennsylvania has an interest in protecting its corporate citizens from fraudulent misrepresentations made there.  *See Hercules*, 566 A.2d at 43 ("We think that the District has a compelling interest in protecting a District of Columbia entrepreneur from fraudulent and negligent misrepresentations, most of them allegedly made in the District, by another business entity based in the capital.")  By contrast, the sole connection to the District appears to be that it is the location of defendants' principal place of business.  In any event, as set forth below, the Court does not believe that the choice of either Pennsylvania or District of Columbia law changes the outcome of this case.

## III.   Count I:  Fraud

### A.      Rule 9(b)

Federal Rule of Civil Procedure 9(b) requires plaintiffs to plead "the circumstances constituting fraud" with particularity.  To satisfy this requirement, a plaintiff must "state the time, place, and content of the false representations, the fact misrepresented and what was retained or given up as a consequence of the fraud[,] . . . and identify individuals allegedly involved in the fraud."  *U.S. ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1256 (D.C. Cir. 2004) (citing *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1278 (D.C. Cir. 1994)).  Defendants allege that plaintiff has not met this standard because the complaint does not identify which defendant "is alleged to have done what act."  (Mot. to Dismiss at 5.)

---

[2]      While one misrepresentation was allegedly made in New York in order to induce plaintiff to refrain from converting its lease to a non-preemptible one (*see* Compl. ¶ 22), this appears to be the sole contact with New York.

With respect to the identification of the individuals allegedly involved in the fraud, the complaint pleads that Rosenthal, Norway, and Riegelman, as agents of both corporate defendants, made specific misrepresentations to plaintiff's representatives.  (*See* Compl. ¶¶ 14, 16-17, 21-23, 32.)  By alleging an agency relationship, plaintiff is claiming that each defendant engaged in the alleged fraudulent representations through their identified representatives.  These allegations are sufficient under Rule 9(b).[3]  *See McWilliams Ballard, inc. v. Broadway Mgmt. Co.*, No. 08-1670, 2009 U.S. Dist. LEXIS 58020, at *10 (holding that "[p]laintiff may base its fraud claims against [defendant corporations] on their vicarious liability for the alleged false statements and omissions made by their agents or officers").

## B.     Parol Evidence Rule

Defendants contend that plaintiff's fraud claim is barred by the parol evidence rule.  (*See* Reply at 5-8.)  Under Pennsylvania law, the parol evidence rule declares that

> where the parties, without any fraud or mistake, have deliberately put their engagements in writing, the law declares the writing to be not only the best, but the only evidence of their agreement[;] that [a]ll preliminary negotiations, conversations and verbal agreements are merged in and superceded by the subsequent written contract[;] and that unless fraud, accident, or mistake be averred, the writing constitutes the agreement between the parties, and its terms cannot be added to nor subtracted from by parol evidence.

---

[3]     The cases on which defendants rely, which involved vague and nonspecific complaints that did not involve allegations regarding the existence of an agency relationship, are inapposite.  *See Sofi Classic S.A. de C.V. v. Hurowitz*, 444 F. Supp. 2d 231, 248 (S.D.N.Y. 2006) (complaint against two individuals insufficient under Rule 9(b) where it failed to specify content of alleged false statements, where and when the statements were made, or identify which defendant made each statement or omission); *Ellison v. Am. Image Motor Co.*, 36 F. Supp. 2d 628 (S.D.N.Y. 1999) (securities fraud claims against law firm and three of its partners insufficient under Rule 9(b) where complaint failed to (1) allege factual allegations giving rise to an inference of fraudulent intent, (2) allege any fraudulent or manipulative act, and (3) differentiate what conduct was attributable to each defendant).

Moreover, because the Court finds that the complaint is sufficient, it will deny defendants' motion for a more definite statement.

*Toy v. Metro. Life Ins. Co.*, 928 A.2d 186, 204 (Pa. 2007) (quoting *Yocca v. Pittsburgh Steelers Sports, Inc.*, 854 A.2d 425, 436 (Pa. 2004) (internal quotation marks omitted) (alterations in original)).  For the parol evidence rule to apply, "there must be a writing that represents the parties entire contract, [which] is determined by assessing whether the writing appears to be a contract complete in itself, importing a complete legal obligation without any uncertainty as to the object or extent of the parties' engagement." *Id.* (citing *Yocca*, 854 A.2d at 436).  Moreover, "an integration clause that states that the writing to meant to represent the parties' entire agreement is a clear sign" that the contract is fully integrated. *Id.*

    While fraud in the execution of the contract is an exception to the Pennsylvania parol evidence rule, fraud in the inducement, as alleged here, is not. *Yocca*, 854 A.2d at 437 n.26 ("[W]hile parol evidence may be introduced based on a party's claim that there was a fraud in the execution of the contract, *i.e.*, that a term was fraudulently omitted from the contract, parol evidence may not be admitted based on a claim that there was fraud in the inducement of the contract, *i.e.*, that an opposing party made false representations that induced the complaining party to agree to the contract." (citations omitted)).  Thus, defendants contend that plaintiff's claim that it was fraudulently induced to enter into the K23 Lease by defendants' misrepresentations concerning the priority of plaintiff's transponder is barred under Pennsylvania law by the parol evidence rule.

    In this case, the NESA, which was incorporated by reference into the K23 Lease, contains the following integration clause:

> This Agreement constitutes the entire agreement of the Parties and supercedes all
> prior correspondence, representations, proposals, negotiations, understandings,
> and agreements of the Parties, oral or written, with respect to the subject matter
> hereof. *Except in the case of fraud*, no Party shall have any right of action against
> the other Party hereto arising out of or in connection with any draft, agreement,
> undertaking, representation, warranty, promise, assurance or arrangement of any

- 10 -

nature whatsoever, whether or not in writing, relating to the subject matter of this
Agreement made or given by any person at any time prior to the date of this
Agreement except to the extent that it is repeated in this Agreement.

NESA § 23.1 (emphasis added).  Defendants contend that this integration clause evinces the

parties' intent to bar parol evidence and that the fraud exception refers only to fraud in the

execution of the contract documents, for otherwise, the integration clause would be rendered

meaningless.  (*See* Reply at 7 n.3, 13-14.)  By contrast, plaintiff contends that the fraud

exception evinces the parties' intent that the contract not be fully integrated in the event that one

party made fraudulent misrepresentations.  (Pl.'s Opp'n at 12.)   The problem with defendants'

argument is that a number of states, including New York (whose law governs the interpretation

of the contract at issue here), hold that a general integration clause such as the one here is

ineffective to bar fraud claims.  *See, e.g., Mfrs. Hanover Trust Co. v. Yanakas*, 7 F.3d 310, 315

(2d Cir. 1993); *Fierro v. Gallucci*, No. 06-5189, 2008 U.S. Dist. LEXIS 38513, at *37-46

(E.D.N.Y. May 12, 2008); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Wise Metals Group*,

LLC, 798 N.Y.S.2d 14, 16 (N.Y. App. Div. 2005); *see also Kronenberg v. Katz*, 872 A.2d 568,

592 & n.45 (Del. Ch. 2004) (noting that "many learned authorities state that typical integration

clauses do not operate to bar fraud claims based on factual statements not made in the written

agreement" and citing such authorities).  Given this governing law, the Court cannot agree with

defendants' position.  Rather, the integration clause is, at best, ambiguous as to whether it bars

only fraud in the execution claims.[4]  Therefore, the Court cannot say as a matter of law that the

contract is fully integrated or that parol evidence bars plaintiff's claim.[5]

---

[4]      Under both New York and Pennsylvania law, parol evidence is admissible to clarify the
meaning of an ambiguous contract term.  *See Korff v. Corbett*, 794 N.Y.S.2d  374, 377; *Yocca*,
854 A.2d at 498.  Moreover, for these same reasons, even if the Court were to conclude that
District of Columbia law applied, it could not, as defendants urge (*see* Mot. to Dismiss at 7-10),
conclude as a matter of law that plaintiff's reliance on defendants' alleged misrepresentations

C.      **Promise to Perform an Act in the Future**

Defendants also argue that plaintiff's fraud claim is barred because, under Pennsylvania law, a promise to perform an act in the future is not actionable in fraud. (*See* Reply at 4-5.) Read in the light most favorable to plaintiff, as the Court must do at this stage, the complaint alleges that defendants represented to plaintiff that they maintained a set order of priority for restoring service to preemptible transponders and that plaintiff's transponder was at the top of the list so that it would be "the last turned off and the first turned on in the event of preemption." (Compl. ¶¶ 16-17.) The complaint alleges that, in order to induce plaintiff to enter into a preemptible lease, defendants produced to plaintiff a "multi-color spreadsheet" to illustrate plaintiff's priority and, after the parties executed the K23 Lease, assured plaintiff that it "had a higher priority transponder" than its competitors. (*See* Compl. ¶¶ 14, 21-22.) These are present misrepresentations, albeit with future consequences; therefore, defendants' argument must fail.[6]

*See Jairett v. First Montauk Sec. Corp.*, 203 F.R.D. 181, 185-86 (E.D. Pa. 2001) (allegation that bank fraudulently represented that checks would not be drawn upon cross-claimants' account without two signatures was a representation that procedures existed to prevent the drawing of such checks, when, in fact, adequate procedures did not exist and, as such, was not a promise perform an act in the future but rather a misrepresentation of an existing fact). Accordingly, the

_____

was objectively unreasonable or that the alleged representations were immaterial because they were not included in the contract.

[5]     Moreover, the parol evidence rule applies only to pre-contract negotiations and representations. *Cottman Transmission Sys., LLC v. Kershner*, 536 F. Supp. 2d 543, 554 (E.D. Pa. 2008). In this case, plaintiff also alleges additional misrepresentations after signing of the contract. Thus, while these additional alleged misrepresentations may be barred for some other reason, they are not barred by the parol evidence rule.

[6]     For the same reason, defendants' similar argument under District of Columbia law fails. (*See* Defs' Mot. to Dismiss at 10-11.)

cases on which defendants rely, which all involve simple promises to do something in the future, are inapposite.  *See Krause v. Great Lakes Holdings, Inc.*, 563 A.2d 1182 (Pa. Super. Ct. 1989) (oral promise to assume debt obligation in exchange for a three-year moratorium on payments and forbearance from immediate legal action); *Shoemaker v. Commonwealth Bank*, 700 A.2d 1003, 1187 (Pa. Super. Ct. 1997) (oral promise of mortgagee to obtain insurance on mortgagors' home); *Edelstein v. Carole House Apartments, Inc.*, 286 A.2d 658, 661 (Pa. Super. Ct. 1971) (oral promise to relieve person of liability on loans if the proceeds of the loans were found to have been used in a certain project).

### D.     Gist of the Action Doctrine

Defendants also contend that plaintiff's fraud and tortious interference claims are barred by Pennsylvania's gist of the action doctrine.  This doctrine "is designed to maintain the conceptual distinction between breach of contract claims and tort claims [by] preclud[ing] plaintiffs from re-casting ordinary breach of contract claims into tort claims." *eToll, Inc. v. Elias/Savion Adver., Inc.*, 811 A.2d 10, 14 (Pa. Super. Ct. 2002) (citation omitted).  The reason for the distinction is that "tort actions lie for breaches of duties imposed by law as a matter of social policy, while contract actions lie only for breaches of duties imposed by mutual consensus agreements." *Id.* (quoting *Bash v. Bell Tel. Co.*, 601 A.2d 825, 829 (Pa. Super. Ct. 1992)).  In *eToll*, because the alleged acts of fraud "arose in the course of the parties' contractual relationship," the alleged fraud involved duties that "were created and grounded in the parties' contract" and the damages claimed would be "compensable in an ordinary contract action," the court concluded that the fraud was "not so tangential to the parties' relationship so as to make fraud the gist of the action." *Id.* at 20-21.

By contrast, plaintiff alleges here that defendants made fraudulent misrepresentations that both induced it to enter into a preemptible lease and to refrain from subsequently converting the lease to non-preemptible service by misrepresenting that plaintiff's transponder had the highest priority for continued operation and restoration in the event of preemption.  Defendants' duty to abide by this priority protocol arose from the representation, not from the parties' contract.  In fact, plaintiff has not even alleged a breach of contract.  Thus, it cannot be said that plaintiff's fraud claims are "inextricably intertwined" with contract claims, and plaintiff's fraud claim is not barred.[7]  *eToll*, 811 A.2d at 21; *see also Binary Semantics Ltd. v. Minitab, Inc.*, No. 07-1750, 2008 U.S. Dist. LEXIS 28602, at *32-33 (M.D. Pa. Mar. 20, 2008) (noting that "it would be a strange result if plaintiff was not able to bring a fraudulent inducement claim because of the 'Gist of the Action' doctrine when there is no breach of contract claim"), *vacated in part on other grounds*, 2008 U.S. Dist. LEXIS 36575 (M.D. Pa. May 1, 2008); *Sullivan v. Chartwell Inv. Partners, LP*, 873 A.2d 710, 720 (Pa. Super. Ct. 2005) (because plaintiff's tort claims did not relate to defendant's failure to perform its contractual obligations but to defendant's fraudulent promises that induced plaintiff to enter the contracts, tort claims were collateral to performance of contracts and therefore not barred).

## IV.   Count II:  Tortious Interference with Contract

Under Pennsylvania law, the elements of tortious interference with contract are "(1) the existence of a contractual relationship between the plaintiff and a third party; (2) purposeful action on the part of the defendant intended to harm the relationship; (3) the absence of privilege or justification on the part of the defendant; and (4) actual damages resulting from the defendant's conduct."  *Stoeckinger v. Presidential Fin. Corp. of Del. Valley*, 948 A.2d 828, 834

---

[7]     For the same reason, plaintiff's tortious interference claim is not barred by the gist of the action doctrine.

(Pa. Super. Ct. 2008) (citation omitted).  Defendants claim that plaintiff has failed to state a claim for tortious interference because it failed to allege either purposeful action by defendant intended to harm plaintiff's contractual relationships nor the lack of privilege or justification. Indeed, defendants argue that plaintiff cannot allege these elements because "Intelsat merely exercised its undisputed contractual right to preempt PIT's service."  (Reply at 9.)

> In fact, the complaint alleges that
>
> Intelsat was aware that PIT has valid contracts with customers such as GoSat that could be terminated by the customer in the event of a satellite service outage exceeding 24 hours, or certainly an outage that exceeded 13 days in total.
>
> Intelsat intentionally took actions it knew would cause PIT's customers to terminate contracts with PIT and seek service from PIT's competitors, including RRSat.  It did so to assist RRSat, one of Intelsat's preferred customers, at the expense of PIT.

(Compl. ¶¶ 41-42.)  These allegations suffice to allege purposeful action by defendant intended to harm plaintiff.  Moreover, plaintiff does not dispute Intelsat's right to preempt plaintiff's service under the K23 Lease.  Instead, plaintiff contends that defendants were obligated to restore plaintiff's service first pursuant to their representations regarding the priority of restoration of service in the event of interruption.

In determining whether a defendant's conduct was improper for purposes of setting forth a cause of action for tortious interference with contract, Pennsylvania courts look to § 767 of the Restatement (Second) of Torts.  *See, e.g., Gerstadt v. Lehigh Valley Infectious Disease Specialists*, No. 08-4869, 2009 U.S. Dist. LEXIS 26452, at *10-11 (E.D. Pa. Mar. 30, 2009); *Triffin v. Janssen*, 626 A.2d 571, 574 (Pa. Super. Ct. 1993).  That section sets forth the following factors for consideration:  (1) the nature of the actor's conduct; (2) the actor's motive; (3) the interests of the other with which the actor's conduct interferes; (4) the interests sought to be advanced by the actor; (5) the social interests in protecting the freedom of action of the actor and

the contractual interests of the other; (6) the proximity or remoteness of the actor's conduct to the interference; and (7) the relations between the parties.  In this case, plaintiff has alleged fraudulent conduct by defendants intended to give economic advantage to their preferred customers who are plaintiff's competitors.  *Cf. Triffin*, 626 A.2d at 574 (noting, as part of its decision that defendants' alleged conduct was not improper, that the conduct was not unlawful, did not violate any standards of professional conduct and involved no deceit or misrepresentation).  Accordingly, the Court cannot say as a matter of law that plaintiff can prove no set of facts that would entitle it to relief.[8]

## V.    Damages Barred by Contract

Defendants also argue that the contract between the parties precludes the recovery of damages.  (*See* Mot. to Dismiss at 12-13, Reply at 15-16.)   Pursuant to § 13.3 the NESA:

> In no event shall either Party be liable for any indirect, special, punitive, incidental or consequential damages whatsoever arising out of or under this Agreement whether under contract, warranty, tort or otherwise, including, without limitation, loss of revenue or profits, regardless or the foreseeability of such damages.

Thus, because the contract bars consequential damages for lost revenue or profits and punitive damages, both of which plaintiff seeks here, defendants contend that the complaint must be dismissed.

Because defendants' contention requires determination of the operation and effect of the limitation of liability clause, the issue is governed by New York law.  (*See* NESA § 21.2.)  As

---

[8]      The Court also notes that, contrary to defendants' assertion (*see* Mot. to Dismiss at 11-12, Reply at 8-9), plaintiff would not be required to establish breach of a third-party contract to maintain a tortious interference claim under District of Columbia law.  *See Casco Marina Dev., L.L.C. v. D.C. Redevelopment Land Agency*, 834 A.2d 77, 84 (D.C. 2003) ("[W]hile we have articulated the third element of tortious interference as procurement of breach, . . . a 'breach' as such is not required, but merely a failure of performance, whether by the terms of the contract in question or not.")

plaintiff correctly argues, under New York law, limitation of liability clauses cannot shield a party from liability for fraud and other intentional wrongdoing.  *See Tomoka Re Holdings, Inc. v. Loughlin*, No. 03-4904, 2004 U.S. Dist. LEXIS 8931, *16 (S.D.N.Y. May 19, 2004 ("[U]nder New York law, a party may not insulate itself contractually from liability for fraud or gross negligence." (citations omitted)); *Kalisch-Jarcho, Inc. v. New York*, 448 N.E.2d 413, 416-17 (N.Y. 1983) ("[A]n exculpatory clause is unenforceable when, in contravention of acceptable notions of morality, the misconduct for which it would grant immunity smacks of intentional wrongdoing. This can be explicit, as when it is fraudulent, malicious or prompted by the sinister intention of one acting in bad faith.")  Accordingly, this claim is not subject to dismissal at this stage.

## CONCLUSION

For the foregoing reasons, defendants' Joint Motion to Dismiss, or in the Alternative, Motion for More Definite Statement [Dkt. #5] is **DENIED**.  This matter is set for an Initial Scheduling Conference on October 2, 2009, at 10:15 a.m.

_____
/s/
ELLEN SEGAL HUVELLE
United States District Judge

Date:  August 21, 2009